49 CCPA

**Application of Edward Burton LeGRICE.**

**Patent Appeals Nos. 6727, 6728.**

United States Court of Customs and Patent Appeals.

May 4, 1962.

Rehearing Denied July 11, 1962.

John H. Leonard, Cleveland, Ohio (Spencer B. Michael, Smith, Michael & Gardiner, Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Joseph Schimmel, Washington, D. C., of counsel), for the Commission of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Judges, and Judge WILLIAM H. KIRKPAT-RICK.*

SMITH, Judge.

The issue on these consolidated appeals is whether appellant is entitled under 35 U.S.C. 161 [1] to a patent on each of his applications serial numbers 709,127 and 709,128, filed January 15, 1958, each entitled "Rosa Floribunda Plant." The Patent Office Board of Appeals affirmed the final rejection of both applications under 35 U.S.C. § 102(b) on the ground that the inventions had been described in printed publications in England more than one year prior to the dates of filing of the said applications. The publications occur in the National Rose Society Annual of England and in catalogues. The Annual describes appellant as having raised the roses described and the catalogues show color pictures of these roses. There is no dispute that the publications relate to and picture the identical roses which were originated by appellant and which he now seeks to patent.

Resolution of the issue on these appeals requires us to determine whether as a matter of law, the English publications constitute, within the meaning of 35 U. S.C. § 102(b), a bar to appellant's right to patents on said applications.

The applicable portion of 35 U.S.C. § 102(b) reads:

"A person shall be entitled to a patent unless— * * * (b) the invention was * * * described in a printed publication * * * more than one year prior to the date of the application for patent in the United States, * * *." [2]

---

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'Connell, pursuant to provisions of Section 294(d), Title 28, United States Code.

1. Sec. 161. Patents for plants
Whoever invents or discovers and asexually reproduces any distinct and new variety of plant, including cultivated sports, mutants, hybrids, and newly found seedlings, other than a tuber propagated plant or a plant found in an uncultivated state, may obtain a patent therefor, subject to the conditions and requirements of this title.

The provisions of this title relating to patents for inventions shall apply to patents for plants, except as otherwise provided. (July 19, 1952, ch. 950, 66 Stat. 804; Sept. 3, 1954, c. 1259, 68 Stat. 1190.)

2. This section is derived from 35 U.S.C. (1946 ed.) 31, R.S. 4886, Act of Mar. 3, 1897, c. 391, which was derived from Act

Thus, the statute expressly prohibits the granting of a patent on an invention or discovery which has been "described in a printed publication * * * more than one year prior to the date of the application for patent in the United States." Long prior to the inclusion of this provision in 35 U.S.C. § 102(b), the courts had construed earlier provisions and had interpreted them with regard to what must be described in a printed publication in order for the publication to be a bar to the grant of a patent. The underlying concept on which the courts permitted such a bar is that the description of the invention in the printed publication was sufficient to give possession of the invention to the public.

The express provision of 35 U.S.C. § 161 permits the granting of patents on the particular classes of plants therein enunciated which include "Rosa Floribunda Plants" disclosed in the applications on appeal. Grant of such a patent is, however, "subject to the conditions and requirements" of Title 35 "except as otherwise provided." Thus, appellant's right to patents on his applications is subject to the bar stated in 35 U.S.C. § 102(b), if the publications in issue meet the legal requirements necessary to establish such a bar.

The particular question of law to be here decided is presented on stipulated facts which, insofar as they relate to the issue, are here quoted from the record:

"4. Each application was accompanied by the conventional formal oath containing the statement that the applicant did not believe the variety of plant was described in any printed publication in any country more than one year prior to his application, but adding the following additional recitations:

"(a) In Serial No. 709,127,— [Charming Maid] 'that certain information relative to the new variety was published in the National Rose

Society Annual, of England, for 1954 on pages 156 and 157 and like information was published more than one year prior to the date hereof in catalogues, but he believes that such information cannot enable anyone to practice the invention by producing the present variety.'; and

"(b) In Serial No. 709,128,— [Dusky Maiden] 'that certain information relative to a new variety was published in the National Rose Society Annual, of England, in 1949 on page 155, and like information was published more than one year prior to the date hereof in catalogues, but he believes that such information cannot enable anyone to practice the invention by producing the variety'.

"5. (a) The disclosures in the Rose Annual of 1949, page 155, insofar as pertinent, is [sic] as follows:

" 'The Gold Medal Award was made to:—(Here follows the list of roses, including Dusky Maiden)—

" '—Dusky Maiden (Hy. Poly.) raised and exhibited by E. B. Le-Grice, North Walsham.—Glowing dark scarlet with dusky velvety sheen. Single blooms carried in large trusses. Size when open 3-in. in diameter. Very fragrant. Vigorous. Foliage dark green and abundant. Bedding. Trial Ground Certificate, 1945. Prune 34.'

"(b) The disclosure in the Rose Annual of 1954, pages 156 and 157, is as follows:

" 'The Trial Ground
" 'List of Trial Ground Awards, 1953
" '(To which is appended the Show Awards in 1953.)
" '(Here follows a list of roses, including Charming Maid)—
" '—Charming Maid (Flor.). Trial Ground No. 624. Reg. No. 269. Dainty Maiden x Mrs. Sam McGredy.

of July 8, 1870, c. 230, sec. 24, 16 Stat. 201. The Act of 1836, c. 357, 5 Stat. 117, sec. 7, referred to "printed publications,"

while the Act of 1793, c. 11, 1 Stat. 318, sec. 6, referred to being "described in some public work."

Raiser and Distributor E. B. Le-Grice, North Walsham. Vigorous growing variety with deep glossy green foliage 16. Freedom from disease 16. Large single flowers borne in small clusters. Colour pink shaded gold 16. Freedom of flowering 16. General effect 6. Fragrance 5. Gold Medal Provincial Show, 1953.'

"6. In each case, the prior catalogue publication referred to in the oath includes a color picture of the rose clear enough to establish identity in appearance between the rose illustrated and the applicant's variety, and the catalogue publication with the picture establishes that the rose described and illustrated is the variety described and claimed in the application, and the rose so described and illustrated is, in fact, the variety so described and claimed in the application."

The unique aspects of plants which are the subject of plant patents have posed numerous problems to various tribunals charged with the application of basic patent law concepts thereto. A review of all the reported decisions dealing with plant patents [3] establishes that the present case presents a legal problem of first impression on which there are no controlling precedents.

35 U.S.C. § 161 is based on an amendment, effective May 23, 1930, to R.S. 4886, (Sec. 31 of former title 35 U.S.C.), which originated in House Bill 11372 of the Second Session of the 71st Congress. The Committee on Patents which reported the bill filed a report stating:

"The purpose of the bill is to afford agriculture, so far as practicable, the same opportunity to participate in the benefits of the patent system as has been given industry, and thus assist in placing agriculture on a basis of economic equality with industry. The bill will remove the existing discrimination between plant developers and industrial inventors. * * * "

The report expresses the hope that the bill "will afford a sound basis for investing capital in plant breeding and consequently stimulate plant development through private funds". It then goes on to state:

"No one has advanced a just and logical reason why reward for service to the public should be extended to the inventor of a mechanical toy and denied to the genius whose patience, foresight, and effort have given a valuable new variety of fruit or other plant to mankind.

"This bill is intended not only to correct such discrimination, but in doing so it is hoped the genius of young agriculturists of America will be enlisted in a profitable work of invention and discovery of new plants that will revolutionize agriculture as inventions in steam, electricity, and chemistry have revolutionized those fields and advanced our civilization."

An identical report was filed by the Senate Committee on Patents.

The unique nature of a plant patent was recognized by the Patent Office Board of Interference Examiners in Dunn v. Ragin v. Carlile, 50 USPQ 472 (1941) where at p. 474 it was recognized "The mere filing of an application for a patent

---

3. Sugar Cane—Bourne v. Jones, D.C., 114 F.Supp. 413.
Dream Navel Orange—Nicholson v. Bailey, D.C., 182 F.Supp. 509.
Nectarine—Kim Bros. v. Hagler, D.C., 167 F.Supp. 665.
Roses—Armstrong Nurseries, Inc. v. Smith et al.; Same v. Hood et al.; The Conard-Pyle Company v. Smith et al.; Jackson & Perkins Company v. Smith et al.; Same v. Hood et al., D.C., 170 F. Supp. 519.

Upright Barberry—Cole Nursery Co. v. Youdath Perennial Gardens, Inc. et al., D.C., 17 F.Supp. 159.
Bacteria—In re Arzberger, 112 F.2d 834, 27 CCPA 1315.
Pineapple Orange—Dunn v. Ragin v. Carlile, 50 USPQ 472.
Syngomium Plant—Ex Parte Foster, 90 USPQ 16.
Peach Tree—Ex Parte Moore, 115 USPQ 145.

for a new variety of plant would not enable anyone to reproduce such a plant."

35 U.S.C. § 161 engrafts the Plant Patent Act onto the basic patent law, which requires us to apply thereto all the rules, regulations and provisions of the basic patent law except that, by the express provision of 35 U.S.C. § 162, a plant patent cannot be declared invalid if its description "is as complete as is reasonably possible."

As indicated by the Committee reports and as provided in the statutory provisions, the law of plant patents is so inextricably bound up with the earlier general patent law that the former cannot be understood without consideration of the latter, and as provided in 35 U.S.C. § 161, the provisions of Title 35 "relating to patents for inventions shall apply to patents for plants, except as otherwise provided."

It appears, therefore, to have been the intent of Congress that plant patents and patents for other inventions should be subject to the same statutory provisions "except as otherwise provided."

■ Thus in determining the meaning of 35 U.S.C. § 102(b) as it applies to patents for plants, the first consideration is that Congress did not provide any exception thereto, so it should be presumed that Congress intended that it should be applied to patents for plants as it had been previously applied to patents for other inventions. In other words, we think Congress, by enacting no exception to 35 U.S.C. § 102(b) with respect to patents for plants, intended that it be interpreted the same for plant patents as it has been interpreted in relation to patents for other inventions. Otherwise a "discrimination" would continue to exist "between plant developers and industrial inventors," which, as indicated in the Committee Reports, Congress intended to eliminate by passage of the Plant Patent provisions.

Since there has been no interpretation of 35 U.S.C. § 102(b) as applied to plant patents, we turn to the prior decisions dealing with its application to patents on other inventions. In these decisions, we find 35 U.S.C. § 102(b) and its predecessor statutes have been interpreted as requiring that the description of the invention in the publication "must be sufficient to put the public in possession of the invention." Curtis on Patents, 3rd ed., Sec. 378; Seymour v. Osborne, 11 Wall. 516, 555, 20 L.Ed. 33.

Robinson on Patents, Sec. 325, entitled "Prior Publication: its Essential Requisites," summarizes the long recognized requirements of a "Prior Publication" as follows:

"The second method recognized by law in which an earlier invention may be made accessible to the public is by Prior Publication. To have this effect the publication must be: (1) A work of public character, intended for general use; (2) Within reach of the public; (3) Published before the date of the later invention; (4) A description of the same complete and operative art or instrument; and (5) So precise and so particular that any person skilled in the art to which the invention belongs can construct and operate it without experiments and without further exercise of inventive skill. Unless a publication possesses all these characteristics it does not place the invention in the possession of the public, nor defeat the claim of its reinventor to a patent."

It is Robinson's 5th characteristic of a prior publication with which we are here concerned. This characteristic is further elaborated in Sec. 330 of Robinson on Patents entitled "Prior Publication: Publication Must Fully Communicate the Invention to the public," which states the rule as follows:

"Finally, the description must place the invention in the possession of the public as fully as if the art or instrument itself had been practically and publicly employed. In order to accomplish this, it must be so particular and definite that *from it alone, without experiment or the exertion of his own inventive skill,*

any person versed in the art to which it appertains could construct and use it." [Emphasis ours.]

Walker on Patents, Deller Edition at p. 271, states:

"And a claim for an article of manufacture may be anticipated by a prior patent or printed publication, which describes the article, without describing any process of making it; *provided a knowledge of the article would teach a skillful mechanic some process of making it.*" [Emphasis ours.]

The underlying public purpose of the patent law, recognized by Congress in enacting the plant patent provisions, is to add to the public store of useful knowledge. This concept is more fully stated in Sec. 36, Robinson on Patents, as follows:

"To stimulate inventive skill and energy is one of the most effective methods of advancing national prosperity, and in modern times especially attracts the attention of all enlightened governments. While it is certain that the human mind, independently of external impulses, is constantly engaged in pushing its investigations into new fields and in achieving new results, it by no means follows that practical inventions in the industrial arts would rapidly be multiplied without the inducement offered by the prospect of pecuniary reward. Such inventions necessitate not only the conception of a new idea by the mind, but the reduction of that idea to practice in some tangible and useful form. This latter process cannot be accomplished by speculation only, but involves experiments, often protracted and expensive, and a degree of physical skill and labor which otherwise applied might secure to the inventor a considerable recompense in money. To lead an able and prudent man to engage in such enterprises as these, some reasonable hope of profiting by his own labors must be aroused with-

in him; and this can be effected only by a promise on the part of the public that if he succeeds in his invention he shall be suitably rewarded. Experience teaches that this is true; the progress of inventive triumphs, in all civilized nations, being directly in proportion to the encouragement offered to inventors by the state."

As pointed out in the Committee Reports, supra, prior to passage of the plant patent provisions, plant breeding and research was dependent, in large part, upon Government funds to Government experiment stations, or to the limited efforts of the amateur breeder. The Committee Report expresses the hope that the bill "will afford a sound basis for investing capital in plant breeding and consequently stimulate plant development through private funds." The Committee Report then continues:

"In addition, the breeder to-day must make excessive charges for specimens of the new variety disposed of by him at the start in order to avail himself of his only opportunity for financial reimbursement. Under the bill the breeder may give the public immediate advantage of the new varieties at a low price with the knowledge that the success of the variety will enable him to recompense himself through wide public distribution by him during the life of the patent. The farmers and general public that buy plants will be able promptly to obtain new improved plants at a more moderate cost."

The way in which a plant patent advances the public purpose and achieves the result which Congress appears to have intended is stated in Appellant's brief as follows:

"A plant patent performs its function by making it profitable to the developer to make as wide a distribution as possible of the res, the plant itself. If the variety is deserving, hundreds of specimens are likely to

be widely distributed, thereby reducing the danger of their perishing in a common disaster. The likelihood of extinction of the res before an improved variety or worthy successor is developed is thus rendered remote. Publicity informs the public where specimens exist. This is how a plant patent adds to the store of *useful* knowledge."

Before passing to an analysis of the case law with respect to the meaning of "described in a printed publication," as this term is used in 35 U.S.C. § 102(b), it must be borne in mind that there are inherent differences between plants and manufactured articles. Should a plant variety become extinct one cannot deliberately produce a duplicate even though its ancestry and the techniques of cross-pollination be known. Manufactured articles, processes, and chemical compositions when disclosed are, however, susceptible to man-made duplication.

Appellant in his brief points out:

"The description of a plant in a plant patent or in a printed publication at best can only recite, as historical facts, that at one time a certain plant existed, was discovered in a certain manner, and was asexually reproduced. This information may be interesting history, but cannot enable others to reproduce the plant. * * * Prior public use and sale of a plant are the avenues by which a plant enters the public domain."

In the case of manufactured articles, processes and chemical compositions, a different situation prevails. Written descriptions and drawings in publications can often enable others to manufacture the article, practice the process or produce the chemical composition. Thus, with respect to publications in these fields, there is a valid basis in public policy for 35 U.S.C. § 102(b) which bars the granting of patents on inventions "described in a printed publication in this or a foreign country * * * more than one year prior to the date of the application for patent in the United States."

The knowledge thus made available to the public must, if it is to anticipate an invention, be practical and complete. As stated in Sec. 227 of Robinson on Patents:

"It is to be remembered, however, that 'knowledge,' in this sense, means such an acquaintance with the invention, on the part of the public, as renders it available to them as a practically operative means. If their knowledge is derived from use in this country, the use must be of such a kind as imparts this information. If it rests on any foreign or domestic patent or publication these must be sufficient to accomplish the same result. In neither of these cases must there be any necessity for the exercise of additional inventive skill, since with the employment of the creative faculties, in the adaptation of any invention to the public use, another obligation is incurred which can only be discharged by protecting that inventor in the exclusive use of the invention. Thus we arrive at a more perfect and exhaustive definition of this attribute of novelty, and see that an invention is to be regarded as new whenever it has not already been brought within the practical knowledge of the public as an operative means, either through prior use at home, or through a prior patent or a prior publication."

In view of the foregoing considerations, it would appear that if section 102 (b) was to be given a different interpretation as to plant patents, it should have been expressly qualified by Congress so that descriptions of plants in printed publications would have been judged by different standards than those so long recognized by leading text writers and the courts. Since no such qualification exists we must, under 35 U.S.C. § 161, apply to the descriptions in the instant publications the same requirements as have been applied to the descriptions in publications in cases dealing with patents on other inventions.

Basically, section 102(b) requires that an inventor, who has placed his invention in the public domain, file his application within one year thereafter or within a year of the time when anyone else may have made it available to the public. Section 102(b) is a recognition that early publication of inventions is to be encouraged and thus does not bar the granting of a patent if the application therefor be filed within one year from the date of the printed publication.

The public purpose of section 102(b) is clear enough, and has been enunciated or assumed in the very considerable body of decisional law in which the clause "described in a printed publication" has been interpreted with respect to whether the publication has in fact conveyed such knowledge of an invention to the public as to put the public in possession of the invention.

■ The briefs of the parties in the instant case support their opposed conclusions by reference to the ample case law, which sets forth particular standards as to what constitutes a "publication." We think the controlling view here is that stated in Seymour v. Osborne, 11 Wall. 516, at page 555, 78 U.S. 516, at page 555, 20 L.Ed. 33 (1870), where the court said:

"Patented inventions cannot be superseded by the mere introduction of a foreign publication of the kind, though of prior date, unless the description and drawings contain and exhibit a substantial representation of the patented improvement, in such full, clear, and exact terms as to enable any person skilled in the art or science to which it appertains, to make, construct, and practice the invention to the same practical extent as they would be enabled to do if the information was derived from a prior patent. Mere vague and general representations will not support such a defence, as the knowledge supposed to be derived from the publication must be sufficient to enable those skilled in the art or science to understand the nature and operation of the invention, and to carry it into practical use. Whatever may be the particular circumstances under which the publication takes place, the account published, to be of any effect to support such a defence, must be an account of a complete and operative invention capable of being put into practical operation."

See also, Wisconsin Alumni Research Foundation v. George A. Breon and Company, Inc., C.C.A. 8, 85 F.2d 166, cert. denied 299 U.S. 598, 57 S.Ct. 191, 81 L. Ed. 441 (1936), Downton v. Yeager Milling Co., 108 U.S. 466, 3 S.Ct. 10, 27 L.Ed. 789; Eames v. Andrews, 122 U.S. 40, 66, 7 S.Ct. 1073, 30 L.Ed. 1064.

■ We think it is sound law, consistent with the public policy underlying our patent law, that before any publication can amount to a statutory bar to the grant of a patent, its disclosure must be such that a skilled artisan could take its teachings in *combination with his own knowledge of the particular art and be in possession of the invention.* Such a doctrine is in accord with that expressed by the Supreme Court when it held patent No. 137,893 invalid in Cohn v. United States Corset Co., 93 U.S. 366, 23 L.Ed. 907. The court stated (p. 377):

"* * * the evidence shows that the Johnson specification, *in connection with the known state of the art at the time when it was filed and published,* was sufficient to enable one skilled in the art of corsetmaking and in the use of the jacquard to make the patented corset." [Emphasis ours.]

It is the position of appellant that the publications relied upon by the examiner and the Board of Appeals in rejecting his applications, are not "enabling" publications, i. e., the published information therein is not sufficient to enable anyone of ordinary skill in the art of plant breeding to practice the invention and produce the disclosed varieties of *rosa floribunda* plants. The validity of appellant's position can be appraised only after one understands the general techniques by

which a rose breeder produces a new rose variety.

Commercial rose-breeders, particularly in this country and England, continually strive to develop new varieties with characteristics of interest to commercial and amateur rose growers. A few of these characteristics are color, fragrance, freedom from various diseases, abundant foliage, firmness, size and shape of flower, number and frequency of blooms, etc. Each of these characteristics is a sex-linked characteristic and as such is subject to the applicable principles of plant heredity and the transmission of inheritable characteristics. The Encyclopedia Britannica (1957), states that the number of hybridized roses introduced commercially each year is over one hundred. Roses have been cultivated for so many centuries and have been hybridized so extensively that it is difficult to refer the cultivated forms to wild prototypes. To facilitate grouping varieties with similar characteristics, a horticultural classification has evolved which is complicated and often inconsistent, since there is considerable overlapping and mergence of classes as the result of intensive interbreeding. A comprehensive list given in J. H. McFarland's Modern Roses IV, 1952, includes some 6,150 names which represents only a small proportion of the roses hybridized and named during the preceding 250 years. Due to the number of variable characteristics, no two varieties, even if from identical parentage, are exactly alike. It has aptly been said by Florence Coates in "The Poetry of Earth" that:

"There is always room for beauty: memory

A myriad lovely blossoms may enclose

But, whatsoe'er hath been there still must be

Room for another rose".

After determining the characteristics desired in a new rose, the rose breeder selects the parent plants for certain of their known characteristics. By the process of cross-pollination a seed is formed in one of the parent plants as the result of the union of each pair of sex cells contributed by the parent plants. Propagation from the resulting seeds is "sexual propagation", which is to be distinguished from "asexual propagation", in that in "sexual propagation" the parent plants each contribute to the formation of the embryo that will develop in the seed and eventually give rise to a plant which differs from either of the parent plants as well as from other plants produced from other seeds resulting from the same cross-pollination. In "asexual propagation," however, the plant is propagated by divisions or cuttings to form clones, each of which is identical to the parent plant and to all other cuttings or clones taken from the parent.[4]

The rose breeder strives to produce by *sexual* progagation a rose having the desired characteristics, after which this particular rose with the desirable characteristics is further propagated by *asexual* methods in which all of the characteristics of that one rose plant, and only that plant, are transmitted to the new plants derived by cutting, etc.

The *rosa floribunda* plants described in the two applications on appeal and in the publications were produced by sexual propagation as the result of the chance arrangement of the almost infinite number of variables arising from the particular chromosomes of the parent plants. The parentage of the "Dusky Maiden" rose is not disclosed in the publications. The parentage of the "Charming Maid" rose is given in the Rose Annual of 1954 as "Dainty Maiden x Mrs. Sam McGredy." To those skilled in the art of rose breeding this indicates that the parent "Dainty Maiden" is the seed parent, i. e., that this parent was selected by the breeder to bear and develop the seeds which result from pollination of its emasculated flowers with pollen taken

4. "Fundamentals in Plant Breeding" by Samuel L. Emsweller, Plants and Gardens, Summer, 1959.

from the other parent, "Mrs. Sam Mc-Gredy." [5]

The production of seeds by cross-pollination does not assure the plant breeder that he has produced a true new plant variety having the characteristics desired. At this step, the principles of heredity and plant genetics introduce such variables that no two seeds from the parent cross can be expected to produce identical plants.

The functions of the chromosomes and genes in transmitting inheritable properties from parents to offspring in plant breeding are brought into play only when the nuclei from different parent plants fuse together to form, in the seed, the nucleus of the new plant. Differences in composition of the fusing nuclei produce an organism which differs from either parent. These differences may be due, for example, to the presence of a duplicated chromatin granule (gene) in one, which may be represented singly or not at all in the other.[6]

While man can and does assist nature by the cross-pollination of selected parent plants, the actual creation of the new plant, because of the almost infinite number of possible combinations between the genes and chromosomes, is not presently subject to a controlled reproduction by act of man. While those skilled in this art now understand the mechanics of plant reproduction and the general principles of plant heredity, they are not presently able to control the factors which govern the combinations of genes and chromosomes required to produce a new plant having certain predetermined desired properties. The plant breeder must time and again recall the lines of Tenny-son's "Flower in the Crannied Wall," after he has completed cross-pollination of the parent stock and awaits the new offspring:

"Flower in the crannied wall,
I pluck you out of the crannies,
I hold you here, root and all, in my hand,
Little flower—but if I could understand
What you are, root and all, and all in all,
I should know what God and Man is."

It is not until the rose breeder has germinated the sexually produced rose seeds from the selected parents and raised plants therefrom to blooming size that he can make the final selections of the individual plant or plants which are to be multiplied by asexual reproduction.

The *rosa floribunda* plants here in issue thus appear to be something more than Gertrude Stein may have observed when she wrote in "Sacred Emily" that "a rose is a rose is a rose is a rose".

In holding that the publications here in issue constitute a legal bar to a granting of patents on the *rosa floribunda* plants described in the applications here on appeal, we think the examiner and the Board of Appeals disregarded what we have found to be the legally imposed limitations on the meaning of the clause "described in a printed publication" in section 102(b) in the prior cases in which the courts have interpreted the clause in determining whether a particular description in a publication will constitute a statutory bar to the grant of a patent. We think the board and the examiner

5. Emasculation of the flower is accomplished by first cutting the petals at the base of a rose bud, then cutting the tip of the bud. The remainder of the pollination step is described in "Roses for the Home," U. S. Department of Agriculture, Home and Garden Bulletin No. 25 (issued May 1953, slightly revised March 1958), by S. L. Emsweller, W. D. McClellan, and Floyd F. Smith, at page 23, as follows:

"The emasculated flower is then covered with a paper bag to keep unwanted pollen from reaching the stigma. In a day or two the stigma is covered with a sticky substance called stigmatic fluid. It is now receptive. Remove the bag, and place the pollen collected from the desired parent plant on the stigma with a camel's hair brush. The paper bag is replaced, and, if the cross-pollination is successful, a seed pod soon starts to form."

6. See Genetics and Eugenics—W. E. Castle, Harvard University Press, 1932 (4th Edition).

were incorrect in overlooking these cases and interpreting the clause "described in a printed publication" in section 102(b) according to what the examiner called "its exact and unequivocal meaning." When used in the Patent Act of 1952, this clause had acquired in the context in which it is used in section 102(b) something other than an "exact and unequivocal meaning" as a result of the judicially imposed limitation that this clause requires that the description of the invention in the printed publication must be an "enabling" description. Our study of the prior cases which have imposed this interpretation on the clause indicates that the proper test of a description in a publication as a bar to a patent as the clause is used in section 102(b) requires a determination of whether one skilled in the art to which the invention pertains could take the description of the invention in the printed publication and combine it with his own knowledge of the particular art and from this combination be put in possession of the invention on which a patent is sought. Unless this condition prevails, the description in the printed publication is inadequate as a statutory bar to patentability under section 102(b).

■ We do not agree with the examiner and the board that this creates an "anomaly" when dealing with plant patents which requires that "plant publications must be totally ignored as printed publications." In view of the long line of cases dealing with other types of inventions antedating 1930, we think Congress, by failing to provide otherwise, intended that the provisions of section 102(b), as applied to plant patents, should not be interpreted otherwise than they had been with respect to other inventions, i. e., that only an "enabling" publication is effective as a bar to a subsequent patent. We do not agree with the view expressed by the examiner that this necessarily requires that plant publications be "totally ignored." Instead, it requires that the facts of each case be carefully considered to determine whether the description in the printed publication in question *does in fact* place the invention in the possession of the public. Each case must be decided on its own particular facts in determining whether, in fact, the description in the printed publication is adequate to put the public in possession of the invention and thus bar patentability of a plant under the conditions stated in section 102(b). While the present knowledge of plant genetics may mean as a practical matter, that the descriptions in such general publications as are here involved cannot be relied upon as a statutory bar under section 102(b), we must be mindful of the scientific efforts which are daily adding to the store of knowledge in the fields of plant heredity and plant eugenics [7] which one skilled in this art will be presumed to possess.

The patent law, as shown by the Committee Reports, was extended to plant patents in order to stimulate interest in the breeding and commercial development of new and valuable plant species. To erect technical barriers to the grant of such patents by a strict and literal interpretation of the clause "described in a printed publication" in section 102(b) as was done by the examiner and Board of Appeals, apparently without consideration of the public purpose underlying the plant patent provisions, seems to us will defeat the purpose of the act by creating conditions for barring plant patents which are different from the long recognized conditions for barring patents on other inventions.

The decision of the board cites numerous decisions as support for its affirmance

---

7. While many such studies undoubtedly are in progress, some idea of the possible additions to the knowledge of plant heredity is found in current seed catalog offerings of peanut seeds which by atomic irradiation will produce plants in which the peanuts are produced above the ground. The chemical colchicine also is widely used to modify genetic characteristics of seeds. Current studies to "break the chromosome code" may also add to the knowledge of plant breeders so that they may someday secure possession of a plant invention by a description in a printed publication as is now possible in other fields of inventive effort.

of the examiner's rejection. It is our view that these decisions either have not been properly interpreted by the board in relying on them to support its view or that they are not controlling upon the issue here.

The board relies heavily on Cohn v. United States Corset Co., supra, which in the solicitor's brief has been characterized as "the landmark case on this aspect of the law," and is relied upon as support for the assertion that "the overwhelming weight of authority supports the proposition that a clear naked description in a prior publication is sufficient under the law to bar a subsequent inventor from obtaining a patent on the identical thing."[8] That the Cohn case did not so hold seems clear to us. However, in view of the reliance placed upon language used in that case and upon the number of cases which agree with the position of the solicitor concerning what the Cohn case is alleged to hold, we shall here discuss the Cohn case in some detail.

The Cohn case involved a suit for infringement of the Cohn patent on a corset which contained the following claim:

> "A corset having the pockets for the reception of the bones formed in the weaving, and varying in length relatively to each other, as desired, substantially in the manner and for the purpose set forth."

The *defense* of invalidity of the Cohn patent was predicated, under a statute which corresponds to 35 U.S.C. § 102(a), on an English provisional specification of one John Henry Johnson as a *prior publication* which was asserted to *disclose* the Cohn invention. The pertinent part of the Johnson disclosure stated:

> "This invention related to the manufacture of what are known as woven corsets, and consists in the employment of the jacquards in the loom,

one of which effects the shape or contour of the corset, and the other the formation of the double portions of slots for the introduction of the whalebones. These slots or double portions are made simultaneously with the single parts of the corset; and, in place of being terminated in a point, they are finished square off, and at *any required length* in the corset, instead of always running the entire length, as is usually the case in woven corsets." [Emphasis ours.]

Referring to the Johnson disclosure, the court stated (p. 370):

> "It is, therefore, fatal to the validity of the plaintiff's patent if, in fact, it does *describe sufficiently* the manufacture described and claimed in his specification. It must be admitted that, unless the earlier printed and published description does exhibit the later patented invention in such a full and intelligible manner as *to enable persons skilled in the art to which the invention is related to comprehend it without assistance from the patent,* or to make it, or repeat the process claimed, it is insufficient to invalidate the patent." [Emphasis ours.]

The court further stated (p. 373):

> "But the claim must be further limited in view of the state of the art when the application for the patent was made. * * * For more than twenty years it has been customary to weave in these gussets bone-pockets stopped off or closed in the weaving at various distances from the edge of the corset.
>
> * * * * * *
>
> "It is manifest, then, that there is nothing in the plaintiff's patent which was not described in the Johnson specification, unless it be that the closed slots or cases mentioned

---

8. In considering this assertion, it should be borne in mind that we are here dealing with an alleged description in a printed publication of applicant's own roses, whereas in the Cohn case, the description in the printed publication was that of an

invention made by a prior inventor, thus in a strict sense, the Cohn case is dealing with a situation covered by 35 U.S.C. § 102(a) rather than the technical bar of 35 U.S.C. § 102(b).

in the former are required to be woven of varying length. A variation in the length of the pockets relatively to each other, as desired, is, as we have seen, the sole distinctive feature of the plaintiff's invention. *But it was well known before Johnson filed his specification that the bone-pockets of a corset must vary in length.* (93 U.S. at 375) [Emphasis ours.]

\* \* \* \* \* \*

"Every person skilled in corset making knew the necessity of such variation. \* \* \*" (93 U.S. at 376)

The crux of the Cohn decision as we see it is:

"\* \* \* the evidence shows that the Johnson specification, *in connection with the known state of the art at the time when it was filed and published, was sufficient to enable one skilled in the art of corset-making and in the use of the jacquard to make the patented corset.*" (93 U.S. at 377.) [Emphasis ours.]

It is in the light of these comments by the court that the true significance of its statements, which the Patent Office and numerous cases quote as to the holding in the Cohn case, can be determined. The court said (p. 377):

"It is quite immaterial, even if it be a fact, that the Johnson specification is sufficient to teach a manufacturer *how to make* the patented corset. It is enough if it sufficiently describes the corset itself. Neither it nor the plaintiff's specification exhibits the process of making. Neither of them set up a claim for a process. The plaintiff claims a manufacture, not a mode of making it; and the important inquiry, therefore, is, whether the prior publication *described* the article. To defeat a party suing for an infringement, it is sufficient to plead and prove that the thing patented to him had been patented or *described in some printed publication* prior to his sup-

posed invention or discovery thereof. \* \* \* It is enough for this case that the invention patented to the plaintiff was *clearly described* in 1854, in the printed publication of the Johnson (Geresme) provisional specification." [Emphasis added.]

The court throughout its opinion in the Cohn case *directly* referred to those skilled in the art, and the knowledge which they possessed. We think it is because of this knowledge, and only because of this knowledge, that the court said "the important inquiry, therefore, is, whether the prior publication described the article."

The solicitor also cites in support of the board's position, the decision of the District Court of Maryland in One-Piece Bifocal Lens Co. v. Bisight Co., 246 F. 450, mod. 259 F. 275 (CCA 4), cert. den. 249 U.S. 606, 39 S.Ct. 288, 63 L.Ed. 799. At page 457, of 246 F. the Court stated:

"The description under consideration is one which does not tell how to make the article it describes. It is one published at a time when those skilled in the art would not either from its disclosures or their knowledge, or from both combined, know how to produce it. For the reasons already stated, it is believed that, even under such circumstances, it may anticipate a later patent."

Prior to this statement the District Court discussed the Cohn case and, basing its analysis of that decision upon the language on page 377 last quoted supra, stated on page 456:

"Is the force of this language materially weakened by the fact that the court went on to point out that what was known at the time the anticipating Johnson's specification was filed, was sufficient to enable one skilled in the art to make the corset?"

In view of our analysis of the Cohn case, supra, we answer the District Court's question in the affirmative. The standard for publications applied by the

District Court is somewhat uncertain, since it is stated that the publication "*may* anticipate a later patent." [Emphasis added.] Whatever may have been its position, we do not agree, as stated supra, with its analysis of the Cohn case.

The case of General Electric Co. v. De Forest Radio Co., 17 F.2d 90 (D.C.Del.), mod. 28 F.2d 641 (CCA 3), cert. den. 278 U.S. 656, 49 S.Ct. 180, 73 L.Ed. 565, is also cited in the solicitor's brief. In the General Electric case, the court stated in essence that a publication which evidences conception of an idea would be enough to "destroy the product claims in suit upon the ground that they are wanting in invention." As its authority, the court cited the Bifocal case, which, as we have previously discussed, based its decision on what we think is an erroneous interpretation of the Cohn case. We therefore decline to accept the statement in the General Electric case as controlling.

The Patent Office also relies upon several additional decisions of this court which are alleged to support its position. Among these cases are: In re Marden and Rentschler, 48 F.2d 428, 18 CCPA 1119; In re Attwood, 253 F.2d 234, 45 CCPA 824; In re Von Bramer et al., 127 F.2d 149, 29 CCPA 1018; In re Crosley et al., 159 F.2d 735, 34 CCPA 882; In re Fink, 62 F.2d 103, 20 CCPA 716; In re Stoll et al., 161 F.2d 241, 34 CCPA 1058; In re Michalek, 162 F.2d 229, 34 CCPA 1124; In re Shackell, 194 F.2d 720, 39 CCPA 847; In re Kebrich, 201 F.2d 951, 40 CCPA 780; In re Inman, 228 F.2d 229, 43 CCPA 709; In re Baranauckas et al., 228 F.2d 413, 43 CCPA 727.

In none of these decisions do we find any support for the position taken by the Patent Office nor anything inconsistent with our position in the instant case.

The Attwood case concerned use, as a reference, of a prior patent which was said by the appellant to cover an inoperative disclosure. The court based its decision on the Marden and Rentschler and Von Bramer cases. The Marden and Rentschler case cited the Cohn case and,

erroneously interpreting that decision, merely stated on page 429 of 48 F.2d, on page 1121 of 18 CCPA that:

"Ductile thorium and the products produced therefrom and claimed in appellants' application were clearly and adequately described in the references of record. Accordingly, in view of the decisions hereinbefore referred to, the question of the operativeness of the methods disclosed in the references is not involved in a determination of the issue of the patentability of the subject-matter of the involved claims."

The Von Bramer case also concerned a rejection based on a reference patent alleged to disclose an inoperative invention. The court held that "It is not necessary that a reference patent for a device or chemical compound disclose an operative process for reproducing the article or product." Authority cited for this proposition was the Cohn, Marden, Bifocal and other cases.

Implicit in all of these cases is the concept of a certain degree of knowledge possessed by one skilled in the arts involved concerning the disclosure of the prior publication and the concept which was sought to be patented, to the end *that this knowledge taken with the disclosure of the printed publications*, was sufficient to place the disclosed invention in the possession of the public. To the extent, if any, that these decisions may conflict with this analysis of the Cohn case, we disagree with them and do not find them conclusive of the issue here.

In the Michalek case, the court stated that skilled workers would, as a matter of course, be able to utilize the process disclosed by the reference to get results within the limits of the product claims of the application at bar. We think this fact situation is sufficient to distinguish this case.

The Board of Appeals cited Merck and Co., Inc. v. Marzall, 91 U.S.App.D.C. 50, 197 F.2d 206. Contrary to the Board of Appeals' position, this case is believed to substantiate the conclusions we have

here reached. The court stated in the Merck case:

"We are dealing solely with an application for a patent on the *compound* itself. Such an application must be denied if there has been any prior disclosure of the compound, even though no practical means for its isolation or manufacture was previously known." [Emphasis ours.]

In 197 F.2d at page 208, the court in footnote 2 sets forth the knowledge which existed at the time the invention was made. It is therein stated:

"2. A witness called by plaintiffs-appellants testified on cross-examination:

\*     \*     \*     \*     \*     \*

" 'Q. Now, with thiamin monobromide at hand, would there have been any difficulty for you as an organic chemist to prepare the thiamin mononitrate?

" 'A. I think if I had been asked at the time that this application was filed to prepare thiamin mononitrate I would have come up with it in very short order. I was confident that such a compound was capable of existence and could be made.

" 'Q. With little difficulty? A. Yes.' "

We think the Merck case must be read in the light of the fact that the knowledge of chemists skilled in producing the compound there in issue was such that a mere disclosure of the chemical constitution of the compound was enough to allow such chemists to produce the disclosed compound. Even in the chemical art, however, where the knowledge of skilled artisans is great, there are limitations on the availability of disclosures in printed publications as bars under section 102 (b).

In the Baranaukas case, this court said, after considering several of the above cases, "we feel constrained to point out that there are limits to the doctrine of those cases \* \* \*. Certainly they do not extend so far as to permit publication of theoretical lists of hundreds or thousands of possible compounds to deny patent protection on such compounds to those who actually discovered them later."

In Shell Development Co. v. Watson, D.C., 149 F.Supp. 279, affirmed 102 U.S. App.D.C. 297, 252 F.2d 861, which the Patent Office further cites to support its position, the court relied on the Merck case and stated further:

"A clear description in a prior publication is all that is necessary under the law to bar a subsequent inventor from obtaining a patent on the identical thing. In other words, a prior publication, in order to defeat a patent, need only exhibit the thing claimed in such an intelligible manner as to *enable persons skilled in the art to which the invention is related, to comprehend* it. Defendant's refusal to grant the claim sought here based upon the Ring Index publication was proper for the Court holds that the name and the structural formula contained in the Ring Index publication constitutes a sufficient description to anticipate. Plaintiff's claim 13 is clearly described in the publication within the meaning of the statutory language. I find for the defendant." [Emphasis ours.]

The court in the Shell case cited the Merck case as its authority. It is therefore in this light that we must construe the court's use of the word *comprehend*. So construed, the Shell case holds that the publication *in the light of the knowledge possessed by those skilled in the art* was sufficient to bar the grant of a patent. We do not find this to be inconsistent with our holding based on contrary facts in the case at bar.

Finally, there is the decision of In re Decker, 1911 C.D. 274, 36 App.D.C. 104, 162 O.G. 999. In this case, as in others which we have previously discussed, the holding of the Cohn case is believed to have been erroneously construed because of an incomplete analysis of the entire opinion of the court. In the Decker case the court said "the [Cohn] court held a

patent for a corset invalid on the ground that it had been fully described in a prior English patent, although the prior patent contained no description of the device by which the corset could be made." To this we again add the all-important words of the court in the Cohn case, that "the known state of the art at the time when * * * [the Johnson specification] * * * was filed and published, *was sufficient to enable one skilled in the art of corset-making and in the use of the jacquard to* make the patented corset." [Emphasis ours.]

## CONCLUSION

■ We therefore hold that descriptions in printed publications of new plant varieties, before they may be used as statutory bars under 35 U.S.C. § 102(b), must meet the same standards which must be met before a description in a printed publication becomes a bar in non-plant patent cases. 35 U.S.C. § 161 does not contain any limitation on this interpretation of the clause "described in a printed publication," and Congress has not "otherwise provided." When so considered, the descriptions in the printed publications here in issue do not meet the requirement of an "enabling" description, as the statute has been interpreted in numerous cases.

The Board of Appeals stated in its decision below that "it is no more absurd to use a disclosure which is not enabling as a bar than it is to grant a patent on such a disclosure; the disclosure in the specifications of these applications are admittedly just as unenabling as the disclosures of the publications." The answer to this apparent anomaly lies in 35 U.S.C. § 162 in which Congress "otherwise provided" by specifically a'lowing for such a description in plant patent applications.

*No such allowance has been made in 35 U.S.C. § 102(b) with reference to the sufficiency of the description of new plant varieties in printed publications.*

Another answer to this apparent "anomaly" is implicit in 35 U.S.C. § 163. The plant patent grant differs from that given with respect to other inventions. Infringers must be shown to have asexually reproduced or sold or used the plant on which the patent was granted. Cf. Cole v. Youdath, supra, Kim Bros. v. Hagler, supra, and Armstrong Nurseries, Inc. v. Smith et al., supra. This section implicitly recognizes there is no possibility of producing the plant *from a disclosure* as 35 U.S.C. § 112 contemplates. Therefore, there is no requirement for any how-to-make disclosure in the application for a plant patent.

The mere description of the plant is not necessarily an "enabling" disclosure. Such descriptions, just as in the case of other types of inventions, in order to bar the issuance of a patent, must be capable, when taken in conjunction with the knowledge of those skilled in the art to which they pertain, of placing the invention in the possession of those so skilled.

The descriptions of the new roses in the instant publications,[9] are incapable of placing these roses in the public domain by their descriptions when interpreted in the light of the knowledge now possessed by plant breeders. The roses disclosed in the appealed applications are not, therefore, "described in a printed publication" within the meaning of 35 U.S.C. § 102(b).

The decision of the Board of Appeals is reversed.

Reversed.

MARTIN, J., sat but did not participate because of illness.

9. An analogy also may be drawn between the pictures of the roses shown in the printed publications and pictures of machines in printed publications which have been held to be insufficient descriptions of the patented invention. See footnote 1, Robinson on Patents, Sec. 326, in which it is stated:

"That a picture or drawing without printed text is not a publication, see New Process Fermentation Co. v. Koch (C.C.1884), 21 F. 580; 29 O.G. 535; Reeves v. Keystone Bridge Co. (1872), Fed.Cas.No.11,660, 1 O.G. 466, 5 Fish. Pat.Cas. 456, 9 Phila. 368; Judson v. Cope (1860), Fed.Cas.No.7,565, 1 Bond 327, 1 Fish.Pat.Cas. 615."