**GALLAND–HENNING MANUFACTURING COMPANY and Chattanooga Welding & Machine Company, Inc.**

v.

**DEMPSTER BROTHERS, INC.**

Civ. A. No. 5735.

United States District Court,
E. D. Tennessee, N. D.

Jan. 22, 1970.

70

Edward Taylor Newton, Newton, Hopkins, Jones & Ormsby, Atlanta, Ga., Fred H. Cagle, Jr., Frantz, McConnell & Seymour, Knoxville, Tenn., Wright & Wright, Milwaukee, Wis., for plaintiffs.

Charles D. Snepp, Knoxville, Tenn., J. Preston Swecker, Burns, Doane, Benedict, Swecker & Mathis, Washington, D. C., for defendant.

## OPINION

FRANK W. WILSON, Chief Judge.

This lawsuit arises under the patent laws of the United States. The lawsuit began as an action for infringement of a patent involving a scrap metal baling press. The defendant denies infringement and contends that the patent sued upon is invalid.

Stating the contentions of the parties more fully, the plaintiffs contend that upon August 15, 1961, United States Letters Patent No. 2,995,999 was issued to the plaintiff, Chattanooga Welding & Machine Company, Inc., as assignee for Mark L. Holt, the inventor, for an invention in a scrap metal baling press. On January 17, 1966, the plaintiff, Chattanooga Welding & Machine Company, Inc., granted an exclusive license to the plaintiff, Galland-Henning Manufacturing Company, for the manufacture and sale of the baling press. The plaintiffs contend that Dempster Brothers, Inc., which is also in the business of manufacturing scrap metal baling presses, has built and sold baling presses which infringed the plaintiffs' patent. The plaintiffs, asserting that they are the owner of a lawful and valid patent infringed by the defendant, seek damages of the defendant as provided by law.

The defendant, Dempster Brothers, Inc., denies any infringement of the patent sued upon, contends that the plaintiffs are guilty of laches and bad faith in bringing the action for infringement, and further contends that the plaintiffs' Patent No. 2,995,999 is invalid. The defendant's invalidity contention is based upon the following assertions: (1) that the invention had been disclosed in printed publications more than one year prior to the plaintiff's application for a patent; (2) that baling presses involving the claims of the plaintiffs' patent were exhibited for sale or sold or were in use for more than one year prior to the date of the patent application; (3) that the claims of the plaintiffs' patent were obvious in the light of the prior art as it existed at the time of the plaintiff's patent application, including prior patents and including prior scrap metal baling presses, as manufactured both by the plaintiff, Chattanooga Welding & Machine Company, Inc., and by the defendant, Dempster Brothers, Inc.; (4) that the claims of the patent are too indefinite and vague, and fail to adequately disclose the subject matter claimed, thereby rendering the patent invalid under §§ 101 and 112 of Title 35 U.S.C.; and (5) that fraud was practiced in procuring the patent in that false representations were made to the Patent Office with regard to the inventor and with regard to the prior use and disclosure of matters claimed in the patent. The defendant accordingly seeks by counterclaim to have the plaintiffs' patent declared invalid and further seeks to recover costs and reasonable attorney fees from the plaintiffs.

In response to the counterclaim the plaintiffs deny any laches or bad faith in bringing this action, deny each contention of the defendant in regard to the invalidity of the patent, assert that the patent is valid and is being infringed by the defendant, and deny that the defendant is entitled to recover costs or attorney fees from the plaintiffs.

In the interest of a more orderly and manageable proceeding, the validity and infringement issues were severed for purposes of trial from the damage issues and the case was tried before the Court sitting without a jury upon these issues. The case has now been submitted for decision of the Court upon the validity and infringement issues on the record made upon the trial, the oral argument of counsel, and the written briefs filed herein. This opinion constitutes the findings of fact and conclusions of law of the Court.

The following matters appear undisputed in the record in this case. Chat-

tanooga Welding & Machine Company, Inc., is a Tennessee corporation with its principal place of business located in Chattanooga, Tennessee. Among other activities, it formerly engaged in the manufacture and sale of scrap metal baling presses. It was so engaged in the manufacture and sale of scrap metal baling presses in 1956 and had been so engaged for a number of years prior thereto. On October 25, 1956, Mark L. Holt, who has since died but who was then an owner and principal officer in Chattanooga Welding & Machine Company, Inc., filed an application with the United States Patent Office for a patent in regard to certain features in a scrap metal baling press. This application eventually matured into a patent designated as #2,934,002, and hereinafter referred to as the "002 patent" (Exhibit P-1). The 002 patent issued as of April 26, 1960. Although the 002 patent is not the patent here in suit, there is a close relationship between it and the patent sued upon, as will hereinafter appear. On March 5, 1958, Mr. Holt filed application for another patent in regard to a scrap metal baling press, designating this application as a "continuation-in-part" of his previous application, which was then still pending in the Patent Office. It was this latter application, filed March 5, 1958, which eventually matured into Patent #2,995,999 (Exhibit P-2). For the sake of clarity and brevity this patent will hereinafter be referred to as the "999 patent." The 999 patent issued as of August 15, 1961. These patents, 002 and 999, were each assigned by Holt at the time of their issuance to Chattanooga Welding & Machine Company, Inc. On January 17, 1966, Chattanooga Welding & Machine Company, Inc., granted an exclusive license to Galland-Henning Manufacturing Company of Milwaukee, Wisconsin, to manufacture and sell scrap metal baling presses incorporating the teaching of both Patents 002 and 999 (Exhibit P-3).

The defendant, Dempster Brothers, Inc., is a Tennessee corporation with its principal place of business in Knoxville, Tennessee. Dempster Brothers, Inc., manufactures and sells machinery and heavy equipment of various kinds, and for a number of years has been a competitor of the plaintiffs in the manufacture and sale of scrap metal baling presses. On August 24, 1966, the plaintiffs filed this lawsuit against Dempster Brothers, Inc., for alleged infringement of the 999 patent. The contentions of the parties and the relevant developments in the lawsuit to this time have previously been set forth in this opinion.

At this point it would lend clarity to the Court's opinion to discuss in a general way the subject matter of the two patents here involved. The recovery and reuse of scrap metal has been a very sizable business for many years. Of considerable importance to the business are hydraulic presses capable of economically reducing scrap to manageable size and shape for shipping and handling. Such presses for baling scrap metal have been on the market for a number of years, substantially predating the patents here involved. Certain features of these presses appear to have become well standardized in the trade at a time likewise substantially predating the patents here involved. These included a heavily reinforced rectangular compression chamber into which scrap is loaded. The chamber is then closed and a hydraulic ram operating longitudinally through the chamber compresses the scrap to a predetermined dimension. A second hydraulic ram operating in a transverse manner across the face of the platen of the longitudinal ram then compresses the metal into a bale of the dimensions desired. Also well known in the trade and used upon presses manufactured by both Chattanooga Welding & Machine Company, Inc., and Dempster Brothers, Inc., prior to the time of the patents we are here concerned with was a hopper mounted on one side of the compression chamber into which a roughly measured amount of loose scrap was initially loaded and then, by hydraulic rotation of the hopper, the scrap was

dumped into the compression chamber. A further common feature of baling presses at that time was a hydraulically operated compression or tamping door mounted on the compression chamber on the side opposite to the loading hopper. The function of the tamping door was to compress scrap into the compression chamber so that the compression chamber might be closed for the baling process.

The 002 patent purports to cover certain improvements in the design and operation of the loading hopper and the compression or tamping door and in the mechanism for ejecting bales from the compression chamber following formation of the bale. The bale ejecting mechanism is not in any way involved here and need not be further referred to. As regards the design and operation of the tamping door and loading hopper, the 002 patent makes claim to the inventive use of a curved loading hopper ("curved skip pan" as it is often referred to in the evidence), so designed and mounted that when it is in a dumping position it fits the arc and dimensions of the tamping door. The operation described in the 002 patent is for the loading hopper to close to the dumping position, then for the tamping door to pass through the arc and chamber thus formed by the hopper and force all metal from the hopper into the compression chamber. The 002 patent also claimed an invention in providing hydraulically operated locking bolts to lock the tamping door in position once it had closed with the compression chamber, thus permitting the tamping door to perform the dual function of compressing scrap into the compression chamber and forming the top of the compression chamber in the baling sequence. This compression door locking device, which forms the basis for the trade name of "Tamp-A-Dor" sometimes used in connection with the Holt baling presses, is likewise not in any way involved here, and need not be further noticed. The Dempster baling presses alleged to have infringed did not use the compression door for the top of the compression chamber, but rather utilized a door that rolled longitudinally into position to form the top of the compression chamber following the compression of the scrap into the compression chamber by the compression door and the lifting of that door.

The 999 patent describes a scrap metal baling press having the same design and features as the baling press described in the 002 patent and then proceeds to make three inventive claims to a method or process of alternately operating the hopper door ("curved skip pan") and the tamping door (compression door) so as to gradually force scrap initially having a dimension larger than the compression chamber, such as an automobile body, into the compression chamber. There is considerable controversy, as seems usual in patent cases, as to exactly what is claimed to be the inventive features in the 999 patent, and, as usual, the parties read the claims quite differently. The Court believes, however, that when the patent is read as a whole, and in conjunction with the file history in the Patent Office, the foregoing is a sufficiently accurate statement of the inventive matters set forth in the three claims of the 999 patent for present purposes. The 999 patent describes the application therefor as a "continuation-in-part" of the application in the 002 patent and, as stated, was filed with the Patent Office at a time when the 002 patent application was still pending in that Office.

Turning the attention of the Court to the validity issue, and more specifically to the defendant's two initial contentions that the 999 patent is invalid in accordance with § 102(b) of Title 35 U.S.C. in that the invention patented therein was disclosed in a printed publication and was in public use or on sale more than one year before the patent was applied for, evidence was introduced upon the trial tending to establish that there may have been publications, public uses, or sales of baling presses by Chattanooga Welding & Machine Company, Inc., in

the years 1954 through 1957 which it is contended described or disclosed the inventions claimed in the 002 patent and in the 999 patent. Before considering this evidence it is important to establish the date of application of the 999 patent, as the one year statutory period regarding prior disclosure must be judged from that date.

As noted above, and as reflected in the patent itself, it is undisputed that the application for the 999 patent was filed upon March 5, 1958. However, the plaintiff contends that the application for the 999 patent was a continuation-in-part of the application for the 002 patent, that the application for the 002 patent was filed October 25, 1956, and that in accordance with § 120 of Title 35 U.S.C., the plaintiff is entitled to claim the date of October 25, 1956, as the date of application for the 999 patent in determining whether any prior publications, sales, or public uses were made in regard to matters claimed in the patent.

Provision for the continuation-in-part applications is found in 35 U.S.C. § 120, which provides as follows:

"An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application."

The above section was added in 1952, but according to the reviser's note in U. S.C.A.: "This section represents present law not expressed in the statute, except for the added requirement that the first application must be specifically mentioned in the second."

The Senate Report commented as follows:

"Sections 120 and 121 express in the statute certain matters which exist in the law today but which had not before been written into the statute, and in so doing make some minor changes in the concepts involved." Senate Report No. 1979, June 27, 1952, 1952 United States Code Cong. and Admin. News, p. 2394.

The use of continuation patent applications apparently developed early in this century. See General Electric Co. v. Independent Lamp & Wire Co., Inc., 267 F. 824, 836 (D.N.J.1920); Badische Anilin & Soda Fabrik v. A. Klipstein & Co., 125 F. 543 (S.D.N.Y.1903); Victor Talking Machine Co. v. American Graphophone, 145 F. 350 (2d Cir. 1906). The continuing application was defined by the Commissioner of Patents in Ex parte Hall, 1920 C.D. 56, 277 O.G. 395, as follows:

"A continuing application is an application filed subsequently to another application, while the prior application is pending, disclosing all or a substantial part of the subject-matter of the prior application and containing claims to subject matter common to both applications, both applications being filed by the same inventor or his legal representative. Defining it in a simpler way, a continuing application is a development of an applicant's earlier application and which is entitled to the filing date of his earlier application for a constructive reduction to practice of the common embodiment of his invention in the two applications." Quoted in In re Febrey, 135 F.2d 751, 757, 30 C.C.P.A. 1099, (1953).

What then must the earlier application contain in order to entitle the later application to the earlier filing date? The Commissioner in Ex parte Hall, *supra*, stated that the later application must disclose a substantial part of the earlier application. In Timken-Detroit

Axle Co. v. Eaton Axle & Spring Co., 56 F.2d 651 (N.D.Ohio 1931), the Court stated:

"I think the formalities of the application are not controlling where it may be fairly determined that the inventor was endeavoring to secure protection for the same idea in the latter as in the earlier application, and that the substantial features of his conception are disclosed in the earlier application. It is not essential that every detail be common to both."

According to the Court in Teter v. Kearby, 169 F.2d 808, 812, 36 C.C.P.A. 706 (1948), "It is immaterial that the subject matter in the last continuing case is claimed for the first time and that no previous claim was made of the subject matter in the earlier filed case." Thus according to the practice of the Patent Office and the court made law prior to the enactment of § 120, the claims of the two applications did not have to be identical. See Chapman v. Wintroath, 252 U.S. 126, 137, 40 S.Ct. 234, 64 L.Ed. 491 (1920); Teter v. Kearby, *supra*. It was that portion of the applications that was common to both that was entitled to the earlier filing date. See Novadel Process Corp. v. J. P. Meyer & Co., 35 F.2d 697 (2d Cir. 1929); Teter v. Kearby, *supra*; Asseff v. Marzall, 88 U.S.App.D.C. 358, 189 F.2d 660 (1951); Timken-Detroit Axle Co. v. Eaton Axle & Spring Co., *supra*.

■■ From a reading of the statute and the cases, it appears that the plaintiff must meet the following requirement to obtain the benefits of the prior application: (1) both applications must be by the same inventor, (2) the prior application must be still pending, (3) the later application must refer to the prior application, and (4) the invention must be disclosed in the prior application. It is upon the fourth requirement that the parties in this lawsuit are in disagreement. The plaintiffs contend that the 999 patent but disclosed a new mode of operation of the invention disclosed in the 002 patent, the baling

presses described in the two patents being identical. The defendant, upon the other hand, contends that the baling presses described in the 002 and the 999 patents are not identical, that the 002 patent describes a press having an automatic operation of the hopper and compression door, whereas the 999 patent calls for manual operation of the hopper and the compression door, that the 999 patent injects "a new matter" into the invention disclosed in the 002 patent in that it is claimed in the 999 patent that the hopper and the compression door operate alternately "in opposition to the other and both in opposition to the bottom of the (compression) chamber," whereas in the 002 patent the hopper and the compression door each make a single movement in sequence, and that not in opposition to each other, nor does the hopper operate in opposition to bottom of the chamber.

In the instant case the two applications are both for a baling press, which is designed to bale scrap metal. The applications each contain nine illustrations of the press. The first four illustrations are identical, being a top view and a side view and two sectional views. Figures 5–9 of the 002 application illustrate fragmentary views of the door, the ejecting mechanism, and one end of the press. In the 999 application Figures 5–9 illustrate how the device could be used to press an automobile body. The general description of the device is almost identical in both patents. Descriptions referring to Figures 5–9 are different. The operation described in the claims is also different in the two applications. It appears, however, that a portion of the subject matter of the plaintiff's invention is common to both applications. The Court is accordingly of the opinion that the plaintiffs are entitled to the earlier filing date for the purpose of determining disclosure of the patented invention by prior publications, sales, or public uses.

The earlier application was filed October 25, 1956. The Court must accordingly look to the evidence of publica-

tions, sales, or public uses more than one year prior to this date in determining whether there was such a prior disclosure of the inventive matters claimed in the 999 patent as to render that patent invalid.

Before turning to the evidence regarding prior publications, sales, or public uses which it is contended disclosed the matters claimed in the 999 patent, it is proper at this point to note that under 35 U.S.C. § 282 a regularly issued patent is presumed valid and the party asserting the invalidity thereof has the burden of establishing his assertion by clear and convincing evidence. Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937); Tillotson Mfg. Co. v. Textron, Inc. Homelite, 337 F.2d 833 (C.A. 6, 1965); and Simplicity Mfg. Co. v. Quick Mfg., Inc., 355 F.2d 1012 (C.A. 6, 1966).

On the issue of prior publications, sales, or public uses, the Court is of the opinion that the following matters are established by clear and convincing evidence. Prior to 1953 the only baling presses designed or manufactured by Chattanooga Welding & Machine Company, Inc., had a rectangular loading hopper, sometimes referred to in the record as a "standard skip pan." The design of this press is as shown in a brochure put out by Chattanooga Welding & Machine Company, Inc., during this period (Exhibit D–1). In the latter part of 1953 Chattanooga Welding & Machine Company, Inc., produced a working model of a scrap metal baling press, the model having a curved loading hopper contoured to fit the arc and the dimensions of the compression door. The compression door on this model also incorporated the "Tamp-A-Dor" features. The model was built to a reduced scale, having dimensions of approximately four feet by two feet by three feet. It could be carried in the rear of a stationwagon. However, it was equipped with a hydraulic system and was fully operative. It was constructed to be used for the purpose of demonstrating to prospective customers the construction and

operation of the Holt baling presses, including the loading operation of the compression door and the contoured loading hopper, but was not intended to be sold or intended to be used itself for baling metal. In demonstrations it would bale light metals, such as metal cans. The model was taken to the annual convention of scrap metal dealers held in Washington, D. C., in January of 1954, but on this occasion the contoured loading hopper was removed and replaced with a standard hopper door. In the Spring of 1954 the contoured hopper door was returned to the model. This model is illustrated in a series of photographs filed in the record (Exhibits 32, 33 and 34). In August of 1954 a display artist prepared a conception of the press from a photograph (Exhibit D–57). This display, along with a series of three other similar displays each showing some stage in the operation of the contoured skip pan and compression door, were used to produce an advertising brochure demonstrating and describing the operation of the Holt "Tamp-A-Dor" baling press (Exhibit D–3). It is this advertising brochure that largely forms the basis of the defendant's contention in regard to prior publication of the matters later claimed in the 002 and 999 patent applications. However, before turning to the advertising brochure, the Court will complete the account of the evidence regarding the model.

The model, equipped with the curved skip pan instead of the standard skip pan, was first shown to a scrap metal dealers convention in Illinois sometime in 1954, this date not being otherwise established in the record. In January of 1955 a representative of Chattanooga Welding & Machine Company, Inc., took the model to the annual scrap metal dealers convention held in Miami, Florida, and there used it to demonstrate to dealers the construction and operation of the Holt scrap metal baling press, including the construction and operation of the curved loading hopper and the compression door. In July or August of 1955 a salesman for Chattanooga Weld-

ing & Machine Company, Inc., a Mr. Schultz, took the model with him on a selling trip, using it to demonstrate the Holt press to scrap dealers, including the Portsmouth Salvage Company of South Norfolk, Virginia, and the Amsco Scrap & Metal Company of Bronx, New York. In the course of this trip, as more fully hereinafter discussed, contracts were obtained from Portsmouth and Amsco for the purchase of Holt presses equipped with the curved skip pan as demonstrated in the design and operation of the model. This completes the relevant evidence in regard to the model other than to state that the evidence clearly establishes that the model incorporated the construction later described in the 002 patent and was capable of operating in the manner described in the 999 patent.

Returning now to the advertising brochure referred to above (Exhibit D–3), it appears that Chattanooga Welding & Machine Company had this brochure printed in the Fall of 1954. The art work for the brochure was done in August of 1954 and the printing appears to have been done in October of 1954. During the next year, as testified to by the former president of Chattanooga Welding & Machine Company and an officer of the Company at that time, these brochures were distributed to scrap metal dealers at conventions and by mail. It appears from correspondence from a scrap metal dealer (Mason Iron & Metal Company) dated September 27, 1955, that one of the brochures formed the basis for his inquiry to Chattanooga Welding & Machine Company (Exhibits D–22 —D–26) which led to a contract being signed on November 28, 1955, for the purchase of a Holt baling press having a "Tamp-A-Dor" and a contour loading hopper (Exhibit D–27).

The advertising brochure being referred to (Exhibit D–3) consists of a three-page letter size foldout, displaying four views of the Holt scrap metal baling press equipped with the "Tamp-A-Dor" and with the contour loading hopper, the four views demonstrating the loading hopper and the compression door at various positions during the loading cycle. In addition to setting forth the various specifications of the press, the brochure contains the following description of the press under the heading "Operation":

"Scrap is charged directly into the contour loader as shown in figure one (1). When the bale button is pressed the contour loader dumps the charge into the baling chamber and locks its curved surface against the Tamp-A-Dor. (3) The Tamp-A-Dor then descends automatically sweeping all scrap into the baling chamber, there are no openings which will cause scrap to be caught between the descending Tamp-A-Dor and a projecting edge. The Tamp-A-Dor locks itself in position automatically as shown in figure 3 at the same time the contour loader returns to the loading position ready to be charged for the next operation. When the bale is made the press opens automatically and ejects the bale, if the bale button is held down at this point the cycle starts again automatically as soon as the ejector and rams return to the starting posiion.

"By simply flicking the control handle from automatic to manual the press can be brought under perfect control by the operator. Should a rail or large shaft accidentally fall into the baling chamber the press will open and stop after fifteen seconds have elapsed."

Completing the statement of the evidence relevant to the contentions of the parties regarding prior publications, public uses, or public sales of baling presses incorporating the matters disclosed in the 999 patent, it appears that three sales of such presses were made by Chattanooga Welding & Machine Company in the Fall of 1955. On September 15, 1955, a contract of sale was entered into between Chattanooga Welding & Machine Company and Portsmouth Salvage Company of Portsmouth, Virginia (Exhibits D–7 and D–46). A second

contract of sale was entered into between Chattanooga Welding & Machine Company and Amsco Scrap Iron & Metal Company of Bronx, New York, on November 16, 1955 (Exhibit D–14). A third contract of sale was entered into between Chattanooga Welding & Machine Company and Mason Iron & Metal Company of Detroit, Michigan, on November 28, 1955 (Exhibit D–27). At the time of these contracts of sale, however, neither of the presses contracted to be sold was in existence. Construction time of three months was provided for in the contract with Mason Iron & Metal Company and construction time of five months was provided for in the contracts with Portsmouth Salvage Company and Amsco Scrap Iron & Metal Company.

Actual construction required longer than the time specified in each contract, with shipment of the baling press to Amsco Scrap Iron & Metal Company having been made on May 11, 1956, shipment of the baling press to Portsmouth Salvage Company having been made on July 10, 1956, and shipment of the baling press to Mason Iron & Metal Company having been made on August 24, 1956.

As noted above, the first full sized scrap metal baling press manufactured by Chattanooga Welding & Machine Company and incorporating the contoured loading hopper and compression door operating in the manner later claimed in the 999 patent was the baling press manufactured for Amsco Scrap Iron & Metal Company and shipped on May 11, 1956. Construction of this press was completed sometime earlier in the Spring of 1956. Following completion of the baling press and prior to shipment, the baling press was operated by Chattanooga Welding & Machine Company and a number of scrap metal dealers were invited to witness its operation. In the course of these operations a number of automobile bodies were baled, using the alternate and cooperative operation of the compression door and the curved skip pan to compress the automobile body into the compression

chamber, all in the manner later claimed in the 999 patent. In fact, there is testimony in the record that the operation of the press later claimed in the 999 patent was first conceived as a result of this operation and demonstration of the baling press. A series of photographs taken at this time and demonstrating the operation of the press were introduced into evidence (Exhibits D–38—D–42). However, it appears clear that, although scrap metal dealers did attend and witness this disclosure of the press and the demonstration of its operation at Chattanooga Welding & Machine Company, these operations were also for the purpose of testing the press and working out any problems in its construction or operation.

Within 30 days after the delivery of the press to Amsco Scrap Iron & Metal Company, that Company had the press in commercial operation, using it to bale automobile bodies by operating the press in the manner later claimed in the 999 patent. A photograph of the Holt baling press in operation at Mason Iron & Metal Company and incorporating the operating features claimed in the 999 patent, was placed by Chattanooga Welding & Machine Company in the program for the scrap metal convention held in Miami, Florida, on January 13–15, 1957 (Exhibit D–60), and in the February 1957 issue of a scrap metal dealers' trade journal (Exhibit D–30).

It is on the basis of the foregoing findings of fact that the Court must decide the respective contentions of the parties regarding prior publication, prior public use, and prior sale of scrap metal baling presses incorporating the plaintiff's invention as disclosed in the 999 patent. In this regard the patent law requires diligence upon the part of an inventor in filing his application. Section 102(b), Title 35 U.S.C., provides as follows:

"A person shall be entitled to a patent unless—

* * * * * *

(b) The invention was * * * described in a printed publication in

this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * * "

This section was designed "to prevent an inventor from concealing his invention while at the same time exploiting it commercially, thereby extending the duration of his legal monopoly." Koehring Co. v. National Automatic Tool Co., Inc., 362 F.2d 100 (C.A. 7, 1966).

■ As found by the Court above, the 999 patent was a continuation-in-part of the 002 patent, so that for the purpose of applying § 102(b) the application date for the 999 patent would relate back to the application date of the 002 patent, which date was October 25, 1956. Accordingly, before a publication, sale, or public use could be the basis for invalidating the 999 patent, the publication, sale, or public use must have occurred prior to October 25, 1955. This alone would eliminate any contention that the baling presses manufactured by Chattanooga Welding & Machine Company in 1956 for Portsmouth Salvage Company, Amsco Scrap Iron & Metal Company, and Mason Iron & Metal Company, and their demonstration to scrap metal dealers would constitute a disclosure by public use or sale of a baling press incorporating the matters claimed in the 999 patent so as to render that patent invalid under § 102(b). Moreover, the demonstration by Chattanooga Welding & Machine Company in the Spring of 1956 of the baling press it had manufactured for Amsco Scrap Iron & Metal Company was for test or experimental purposes and would not constitute a "public use" within the meaning of the statute. City of Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 (1877). As stated in the case of FMC Corp. v. F. E. Myers & Bros. Co., 384 F.2d 4 (C.A. 6, 1967):

"While 'the purpose of the 1-year statutory bar is to prevent an inventor from obtaining profits on his invention for a number of years and then at a later date obtaining a patent' (citations omitted), the necessity of permitting a period of experimentation has been recognized. Thus, an exception to the public use provision is made where the use is one 'which may be properly characterized as substantially for purposes of experimentation.'" (Citations omitted).

The effective application date of October 25, 1955, would also eliminate any consideration of the defendant's contentions regarding sales of presses to Amsco Scrap Iron & Metal Company and Mason Iron & Metal Company in 1955, as well as the delivery and commercial use of these presses in 1956, as the contracts for sale of these presses were not entered into until November of 1955 and the presses were not delivered or placed in commercial use until the summer of 1956.

In view of the use of the operative model baling press by Chattanooga Welding & Machine Company for demonstrations during 1954 and 1955, as recounted above, and in view of the sales contract entered into between Chattanooga Welding & Machine Company and Portsmouth Salvage Company on September 15, 1955, likewise as recounted above, the Court must consider further whether a baling press disclosing the invention claimed in the 999 patent was "on sale," within the meaning of § 102(b), Title 35 U.S.C., more than one year prior to the date of the patent application. The plaintiff contends that no baling press incorporating the 999 patent claims was in existence prior to October 25, 1955, and that a baling press could not be "on sale" until it was in existence. On the contrary, the defendant contends that a baling press disclosing the 999 patent was "on sale" when the operative model press was used for sales demonstration purposes during 1954 and 1955. The defendant further contends that the sales contract with Portsmouth Salvage Company (Exhibits D–7 and D–42) dated September 15, 1955, was itself sufficient to place the invention "on

sale," particularly when considered in conjunction with the use of the model.

While the statute does not speak in terms of an actual sale, but rather in terms of the invention being "on sale," the words of the statute indicate that the sale contemplated is such as creates an opportunity for present public use. In Wende v. Horine, 225 F. 501 (C.A. 7, 1915) the Court interpreted the "on sale" provisions thusly:

"The statute does not require a 'sale' but only a placing 'on sale' prior to two years before the application. Under this language a completed sale, either with or without delivery, is not demanded; an offer to sell, made to a prospective purchaser after the experimental stage has been passed, the invention reduced to practice, and the apparatus manufactured in its perfected form, is a placing on sale within the statute. (Citations omitted)"

A similar conclusion was reached by the Court in the case of Burke Electric Co. v. Independent Pneumatic Tool Co., 234 F. 93 (C.A. 2, 1916), where the Court stated:

"The combination of the words indicates that the sale contemplated is such as creates an opportunity for present use * * * If patented articles are on hand ready to be delivered to any purchaser, they are on sale, whether any of them has been sold or not. But if they are not, they cannot be said to be on sale within the meaning of the Act, though the invention itself has ceased to be experimental and is complete."

In line with this interpretation of "on sale," it is generally held that to be on sale a device incorporating the invention must have existed in its ordinary or contemplated usable form and must have been on hand ready for delivery more than one year prior to the patent application date. B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co., 124 F.2d 95 (C.A. 1, 1941) cert. denied 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 219; McCreery Engineering Co. v. Massachu-

setts Fan Co., 195 F. 498 (C.A. 1, 1912); F. E. Myers & Bros. Co. v. Goulds Pumps, Inc., 91 F.Supp. 475 (W. D.N.Y., 1950). While usable samples of a product or device disclosing the invention later patented may be sufficient to place the invention "on sale" even though the samples are not production models, Amphenol Corp. v. General Time Corp., 397 F.2d 431 (C.A. 7, 1968); J. L. Clark Mfg. Co. v. American Can Co., 256 F.Supp. 719 (D.C.N.J., 1966); Chicopee Mfg. Corp. v. Columbus Fiber Mills Co., 165 F.Supp. 307 (D.C.M.D.Ga., 1958), and even though the display of a mockup may be sufficient to place the invention on a design patent "on sale," Philco Corp. v. Admiral Corp., 199 F. Supp. 797 (D.C.Del., 1961), a model of a scrap metal baling press built to a reduced scale rendering it commercially unusable is not available for present public use and accordingly is not sufficient to render the invention disclosed therein "on sale." The additional factor of a sales contract having been made in September of 1955, more than one year prior to the patent application, does not alter the situation, since no usable baling press was ever on hand and ready for delivery more than one year prior to the patent application date.

There remains to consider the issue of whether Chattanooga Welding & Machine Company made a disclosure of the invention in the 999 patent by a printed publication more than one year prior to the October 25, 1956, patent application date. It will be recalled that § 102(b) provides that a patent will be denied if "the invention was * * * described in a printed publication in this or a foreign country * * * more than one year prior to the date of the application for patent in the United States * * *." The resolution of this issue is dependent upon the Court's findings of fact in regard to the advertising brochure (Exhibit D–3) as recounted above. The Court is of the opinion that the evidence is clear and convincing that this brochure was printed and distributed in the scrap metal trade for a period sub-

stantially prior to October 25, 1955, that is to say, for a period of more than one year prior to the October 25, 1956, application date for the 002 patent. As stated in the Court's findings regarding the brochure, the evidence is clear and convincing that the brochure was printed in the Fall of 1954 and that it was distributed in the scrap metal trade during the next year. These facts are established not only by the production of the brochure itself and the testimony of those responsible for printing the brochure, but also by the testimony of the former president of Chattanooga Welding & Machine Company and by the president and the general manager of the Mason Iron & Metal Company, who, on the basis of having read the brochure, initiated correspondence with the Chattanooga Welding & Machine Company in September of 1955 which led to the purchase of a baling press in November of 1955.

The plaintiff contends that an advertising brochure sent to persons in the trade is not a "printed publication" within the meaning of § 102(b), and in support of this position relies upon the cases of New Process Fermentation Co. v. Koch, 21 F. 580 (D.Mich., 1884) and Judson v. Cope, 1 Fish.Pat.Cas. 615, Fed.Cas. No. 7565 (C.C.Ohio, 1860). Not only do these cases speak in terms of "drawings alone" being insufficient to constitute an invalidating prior printed publication, but both reason and more recent and persuasive authority establish that an advertising brochure or catalogue distributed generally to a trade may be a "printed publication" within the meaning of § 102(b). As stated by Judge Learned Hand in the case of Jockmus v. Leviton, et al., 28 F. 2d 812 (C.A. 2, 1928):

"* * * We are content to follow the ruling in Imperial Glass Co. v. Heisey, 294 F. 267 (C.C.A. 6), that a catalogue distributed generally to a trade is a publication within Revised Statutes § 4886, 35 U.S.C.A. § 31. It may indeed be that such a document was not a 'public work' under the act of 1836 (5 Stat. 117), and that Parsons v. Colgate (C.C.) 15 F. 600, was rightly decided, though the brief comment in the opinion does not make the distinction. Reeves v. Keystone Bridge Co., 20 Fed.Cas. 466, No. 11,-660, only threw out a doubt, and went off on another point. While it was laid down without discussion in New Process Fermentation Co. v. Koch (C. C.) 21 F. 580, 587, that circulars were not publications, it was unnecessary to the decision and certainly was not its chief reliance. Britton v. White Mfg. Co. (C.C.) 61 F. 93, was decided without discussion, and on the authority of the three cases, just cited, which support it only so far as we have said. The aggregate of these authorities is not so imposing as to cause us any hesitation in following the Sixth Circuit. On principle we are entirely in accord, for the purpose of the statute is apparent, and we ought to effect it so far as its language will allow. While it is true that the phrase, 'printed publication,' presupposes enough currency to make the work part of the possessions of the art, it demands no more. A single copy in a library, though more permanent, is far less fitted to inform the craft than a catalogue freely circulated, however ephemeral its existence; for the catalogue goes direct to those whose interests make them likely to observe and remember whatever it may contain that is new and useful."

See also Imperial Glass Co. v. Heisey, 294 F. 267 (C.A. 6, 1923); Hamilton Laboratories v. Massengill, 111 F.2d 584 (C.A. 6, 1940), cert. denied 311 U.S. 688, 61 S.Ct. 65, 85 L.Ed. 444; National Latex Products Co. v. Sun Rubber Co., 274 F.2d 224 (C.A. 6, 1959), rehearing denied 276 F.2d 167, cert. denied 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022; Dixie Dredge Corp. v. American Marine & Machinery Co., 252 F.Supp. 523 (D.C. M.D.Tenn., 1966); John T. McCoy v. Schuster, 44 F.Supp. 499 (D.C.S.D.N.Y., 1942).

The plaintiff also seeks to avoid a finding of publication of the brochure

82

(Exhibit D–3) by contending that the date and fact of publication cannot be established by oral testimony. In support of this the plaintiff relies upon the cases of Washburn & Moen Mfg. Co., et al. v. Beat'em All Barbed-Wire Co., et al., 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1891); National Latex Products Co. v. Sun Rubber Co., 274 F.2d 224 (C. A. 6, 1959); Cold Metal Products Co. v. E. W. Bliss Co., 285 F.2d 244 (C.A. 6, 1960). These cases, however, do not stand for the proposition that oral testimony is inadmissible on the issue of invalidity. Rather, they stand for the proposition that oral testimony on the issue of prior invention, when not otherwise corroborated, must be scrutinized closely and is insufficient unless it is strong, clear, and convincing, some cases going so far as to state that it must establish the facts testified to beyond a reasonable doubt. See Washburn & Moen Mfg. Co., et al. v. Beat'em All Barbed-Wire Co. et al., *supra*. The rule in regard to oral testimony on the issue of anticipation is well stated by Judge Peck in the case of A. J. Industries, Inc. v. Dayton Steel Foundry Co., 394 F.2d 357 at 361 (C.A. 6, 1968):

> "Defendant has the burden of proving anticipation by evidence which is strong, clear and convincing (citations omitted). While it is true that oral testimony alone, unsupported by any contemporaneous documents, is not the best type of evidence to show anticipation by prior art device, the use of such evidence is not necessarily fatal to defendant's case (citations omitted)."

In the present case, not only is the date and fact of printing and publication of the brochure strong, clear, and convincing from the oral testimony, but these matters are corroborated by contemporaneous correspondence and other dated records.

 Turning to the disclosures made in the brochure (Exhibit D–3), it will be recalled that the content of the brochure was summarized above. The legal test to be applied in determining whether the disclosures in a prior printed publication are sufficient to render a subsequently issued patent invalid is well settled. It is that the disclosure and description of an invention appearing in a printed publication more than one year prior to the date of the patent application will invalidate the patent if the disclosure and description are sufficiently clear and exact to enable one skilled in the art or science to which the invention appertains to reproduce or practice the invention without resort to the patent or other subsequent disclosures in the art or science. See Ballantyne Instruments & Electronics, Inc. v. Wagner, 345 F.2d 671 (C.A. 6, 1965) and cases cited therein.

The state of the art in regard to scrap metal baling presses on and prior to October 25, 1955, is well established in the record. This is set forth in the Jones reissue Patent #23,737 (Exhibit D–71), as well as in the brochure advertising the scrap metal baling press manufactured and sold by Chattanooga Welding & Machine Company prior to 1954 (Exhibit D–1), and the brochure advertising various models of baling presses manufactured by Dempster Bros., Inc., prior to 1954 (Exhibit P–15). One skilled in the art of the construction and operation of scrap metal baling presses as that art existed at the time of the printing and publication of the advertising brochure (Exhibit D–3) in 1955 would have been familiar with everything later reflected in the 002 patent other than three items, the bale ejecting mechanism, the construction and operation of the compression door, and the construction and operation of the loading hopper. Neither the bale ejecting mechanism nor the construction of the compression door is in any way involved in the 999 patent. Reading the claims in the 999 patent in the broadest possible manner, the only advances over prior art disclosed in the 999 patent, as that prior art existed in 1955, was the use of a baling press having a curved loading hopper so designed and mounted as to fit the arc and dimensions of the compression door and

having a capability of cooperating with the compression door so as to compress into the compression chamber metal initially having a dimension greater than the compression chamber.

■ As previously noted, the advertising brochure (Exhibit D–3) contains four illustrations of the Holt scrap metal baling press having a curved loading hopper, the four illustrations demonstrating the loading hopper and the compression door at various positions during the loading cycle. The illustrations in the brochure correspond well with the patent drawings Nos. 1–4 in both the 002 patent and the 999 patent, the only significant difference being that the illustrations in the brochure are in prospective views rather than the plain views contained in the patents. The identity of structures in this regard is further demonstrated in the record by a marked copy of the brochure (Exhibit D–3A) bearing numbered references corresponding to the numbered references in the patents. The identity of the structural disclosures appears undisputable. The identify of the disclosures in Exhibit D–3 and both the 002 and 999 patents is further shown when the description of the operation of the baling press as set forth in the brochure is compared with the description of the operation of the press as set forth in the application for the 002 patent (see Exhibit D–69 at p. 6). The publication is clearly a sufficient disclosure of the construction of the contoured hopper and of the operation of the contoured hopper in cooperation with the compression door to force scrap into the compression chamber. The hopper and the compression door are described as being subject to control and cooperative action by the operator. As stated in the brochure, "By simply flicking the control handle from automatic to manual, the press can be brought under control by the operator." Furthermore, once the construction of the contoured hopper had been disclosed, the cooperative action of the curved skip pan with the compression door so as to compress into the compression chamber metal initially having a dimension greater than the compression chamber would be obvious to a layman, much less to one skilled in the art. The Court is accordingly of the opinion that the evidence is strong, clear, and convincing that the invention claimed in the 999 patent was fully disclosed in the printed brochure (Exhibit D–3) published and distrubuted by Chattanooga Welding & Machine Company to those engaged in the scrap metal trade in the United States more than one year prior to the effective application date of the 999 patent, and that, pursuant to § 102(b), Title 35 U.S.C., the said patent is accordingly invalid.

Although the foregoing is decisive on the issue of validity, there remain a number of issues which the Court should decide in order that this opinion may be complete. One such issue is the defendant's contention that the 999 patent is invalid over prior art. In support of this contention the defendant cites 14 patents which it contends anticipate the invention disclosed in the 999 patent (Exhibit D–71). The defendant also relies upon prior use of a flat plate mounted on top of a standard loading hopper and the cooperation of the flat plate with the compression door to force an automobile body into the compression chamber as being prior art. The defendant also contends that the claims in the 999 patent read equally well upon the operation of a press having a standard loading hopper, it being the defendant's contention in this regard that the compression door and the standard hopper act in "opposition to the other and both in opposition to the bottom of the chamber" to force scrap metal initially having a dimension greater than the compression chamber into the compression chamber. See Exhibits D–113 and D–113A. Finally, the defendant contends that since both curved bottom hoppers and flat bottom hoppers were old in the baling press art at the time of the 002 and 999 patent applications, the claims in the 999 patent could not withstand the test of obviousness.

Suffice it to say that the Court is of the opinion that the prior art patents relied upon by the defendant, including the Jones reissue Patent #23,737, the only prior art patent on which any testimony was introduced, do not anticipate the claims of the 999 patent, either from a structural or from a functional standpoint. The Jones patent does not call for a loading hopper so constructed or so mounted as to conform to the arc and dimensions of the compression door, thereby permitting the formation of a chamber for compression of scrap metal into the compression chamber. Without such construction, the functional claims of the 999 patent could not be achieved. The Court is of the opinion that the prior art patents cited by the defendant are insufficient to overcome the presumption that the 999 patent was validly issued.

As regards the evidence of the use of a flat plate mounted on the standard hopper and the cooperative crushing action between this plate and the compression door to force an automobile body into the compression chamber, not only did this evidence relate to a baling press purchased and placed into operation in 1957 (see the testimony of the witness David Levine and Exhibits D–62—D–66), but also the flat plate mounted on a standard hopper does not anticipate the structural specifications of the 999 patent.

The Court is likewise of the opinion that the defendant's contention that the claims of the 999 patent read equally as well on the operation of a baling press having a standard loading hopper as they do on a press having a contoured loading hopper is without merit. This in effect is but another way of stating that the Jones reissue Patent #23,737 anticipates the 999 patent, a matter heretofore dealt with. Moreover, the usual operation of baling presses having standard loading hoppers was to rely upon gravity for emptying the scrap from the loading hopper to the compression chamber when the hopper was in dumping position, and not to rely upon interaction of the loading hopper and the compression door to force scrap out of the hopper and into the compression chamber.

Finally, the defendant's contention that the claims of the 999 patent were invalid as being obvious in the light of prior art is also believed to be without merit. While there was a prior art patent regarding the baling of automobile bodies [Moyers Patent #2,932,-244 (Exhibit D–71, Tab 11)] and while there were prior art patents having loading hoppers with both flat bottoms (Jones reissue Patent #23,737) and curved bottoms (Lindeman Patent #1,879,356) (Exhibit D–71, Tabs 1 and 7), the evidence reveals no prior art patents in which a curved loading hopper forms an enclosed chamber with the compression door to force scrap into the compression chamber by interaction of the two structures. While the structure and operation of such a curved loading hopper may now seem obvious, it apparently escaped those skilled in the trade until the 002 patent was filed. If the 999 patent asserted only functional claims, as now contended by the defendant, then it would be true that such claims would be obvious and therefore invalid, as hereinabove found by the Court in regard to the prior printed disclosures in the advertising brochure (Exhibit D–3). It is also true that the patentability of apparatus claims must depend upon structural limitations and not upon mere statements of functions, Application of Michlin, 256 F.2d 317 at 320, 45 C.C.P.A. 1028 (1958). The Court, however, does not read the 999 patent as asserting only functional claims. Rather, structural limitations must also be read into the claims.

A final contention of the defendant as regards the issue of validity is that the 999 patent is invalid by reason of fraud practiced upon the Patent Office. It is contended that the application for the patent falsely represented that M. L. Holt was the inventor, when in fact the invention was first conceived and reduced to practice by Frank Wright, an

officer and development engineer with Chattanooga Welding & Machine Company. It is further contended that information regarding prior printed publications, prior public uses, and prior sales and prior patents was knowingly and intentionally withheld from the Patent Office by the patent applicant.

 Insofar as it is contended that M. L. Holt was falsely represented as the inventor, there is testimony in the record by the witness, Frank Wright, that he, and not Holt, was the inventor of the matters claimed in both the 002 patent and the 999 patent. There is no corroboration of this evidence. Rather, it appears that Wright was aware of the patent application having been made in the name of Holt at the time that the application was pending and that he co-operated in certain respects in furthering the application, all without making any claim to being the inventor. The defendant has failed to carry the burden of proof establishing any fraud in this respect.

Turning to the defendant's contention that fraud was practiced on the Patent Office in that Holt, the applicant, knowingly withheld in his patent application information regarding prior printed publications, prior public uses, prior sales, and prior patents, there exists a preliminary issue as to the admissibility of certain evidence. In the course of preparing for the trial of this case the defendant took the deposition of one Lamont Johnson, a patent attorney, who represented Holt in making and processing the application for both the 002 patent and the 999 patent. Prior to taking Mr. Johnson's deposition it appears that the defendant had been permitted by Mr. Johnson to examine certain portions of his file relating to the patents and make copies thereof and was to that extent familiar with its content. At the time the deposition was taken the plaintiffs objected to the disclosure of the contents of the attorney's file and the Court thereupon ordered the file taken as a sealed exhibit (Exhibit D–101L). Upon the trial the defendant offered into evidence the deposition of Mr. Johnson (Exhibit D–101M) and certain correspondence from his file previously made available to the defendant (Exhibits D–101A—D–101K). This correspondence was admitted at the trial for identification only, the same not being otherwise received in evidence. The defendant now seeks to have the Court reconsider its ruling and admit into evidence Exhibits D–101A through D–101K. It is the contention of the defendant in this regard that the exclusion of this evidence is an improper application of the statutory provision regarding privileged communications between an attorney and his client. The defendant further contends that even though the documents should be considered as falling within the attorney-client privilege as defined by statute, the statutory privilege does not apply when the communication between the client and the attorney involves the perpetration of a fraud.

 The privileged nature of communications between a client and his attorney was recognized at common law. This privilege was designed to encourage full disclosure by the client and its purpose has been described as follows:

"It is a rule founded in the interest of the administration of justice and is intended to enable a client to place unrestricted and unbounded confidence in his attorney in matters affecting his rights and obligations without danger of having disclosures forced from the attorney on the witness stand." 58 Am.Jur., "Witnesses" § 462 (1948).

This privilege has now been incorporated into the statutory law of a number of jurisdictions, including Tennessee. Section 29–305, Tennessee Code Annotated, provides as follows:

"No attorney, solicitor, or counsellor shall be permitted, in giving testimony against a client, or person who consulted him professionally, to disclose any communication made to him as such by such person, during the pend-

ency of the suit, before or afterwards, to his injury."

The attorney-client privilege has been recognized in a number of patent cases. See Great Lakes Carbon Corp. v. Continental Oil Co., 345 F.2d 175 (C.A. 5, 1965); Hogan v. Zletz, 43 F.R.D. 308 (D.C.N.D.Okla., 1967), affirmed 392 F. 2d 686 (C.A. 10, 1968); Chore-Time Equipment, Inc. v. Big Dutchman, Inc., 258 F.Supp. 233 (D.C.W.D.Mich.1966); Ellis-Foster Co. v. Union Carbide & Carbon Corp., 159 F.Supp. 917 (D.C.N.J., 1958).

 As observed by the Tennessee Supreme Court in the case of Johnson v. Patterson, 81 Tenn. 626, 13 Lea 626 (1884), the Tennessee statute is only declaratory of the common law and does not exclude all communications between an attorney and his client. After quoting the language of the statute, the Court had this to say:

"This language excludes all communications and all facts that came to the attorney in the confidence of the relationship. But there are many transactions between attorney and client that have no element of confidence in them, of which he is competent to testify * * *" p. 649

Of the Exhibits D–101A through D–101K, only Exhibit D–101C and D–101F involve communications from the client to the attorney. The remaining exhibits are communications from the attorney to the client, reporting on matters related to the patent applications. Accordingly, Exhibits D–101A, B, D, E, G, H, I, J, and K will be admitted into evidence.

Defendant seeks to gain the admission of the two remaining exhibits, Exhibits D–101C and D–101F, upon the contention that they involve evidence of the perpetration of a fraud, removing them from protection of the statute. In support of this contention the defendant relies on the case of McMannus v. State, 39 Tenn. 213, 214, 2 Head. 213 (1858), wherein the Court held that the attorney-client privilege does not apply if the purpose of the communication was in furtherance of the perpetration of a crime. Cases from other jurisdictions remove the privilege if the communication is in furtherance of a fraud. Union Camp Corp. v. Lewis, 385 F.2d 143 (C. A. 4, 1967).

 However, considering all of the communications between the attorney and the client, and even including the communications from the client to the attorney, the Court cannot read into these exhibits evidence of the perpetration of a fraud upon the Patent Office. Although this Court has now found that a prior printed publication disclosing the matters claimed in the 002 and 999 patents was made, there is no evidence that Holt withheld from the Patent Office facts within his knowledge of prior printed publications, prior public uses, prior sales, or prior patents. As found herein by the Court, the evidence does not now reflect that there were any prior public uses, prior sales, or prior patents predating by more than a year the effective date of the patent application. The defendant's contentions regarding the perpetration of fraud upon the Patent Office in regard to the 999 patent are accordingly found to be unsupported by the evidence.

Having concluded that the invalidity of the 999 patent has been established under § 102(b), Title 35 U.S.C., by reason of clear and convincing evidence of a printed publication disclosing the invention having been made more than one year prior to the date of the application for the patent, the issue of infringement is no longer before the Court. However, again for the purpose of completeness, the Court will pass upon this issue apart from the conclusion of invalidity. Furthermore, a weighing of the evidence upon the issue of infringement is relevant to a decision of the claim by the defendant for the allowance of attorney fees to it as the prevailing party.

The evidence is undisputed that the defendant has, since the granting of the 999 patent, marketed scrap metal baling presses having curved loading hoppers so constructed and so mounted as to con-

form to the arc and dimensions of the compression door, thereby permitting the formation of a chamber for the compression of scrap metal into the compression chamber. The evidence is likewise clear that a Dempster baling press so constructed was sold to Mervis & Sons, Inc., scrap metal dealers in Kokomo, Indiana, in 1966. It further appears that this press was not only capable of operating in the manner set forth in the claims of the 999 patent, as testified to by the plaintiffs' expert witness, Roy A. Martin, but also that it regularly operated in this manner, as testified to by Samuel Mervis, the owner of the press.

Although the defendant is the prevailing party under the decision of the Court, in view of the involved nature of the proof on the issue of validity and in view of the evidence supporting the plaintiffs' claim for infringement but for the invalidity of the patent, the Court is of the opinion that this is not such an exceptional case as would warrant the Court awarding attorney fees unto the defendant pursuant to § 285, Title 35 U.S.C.

In accordance with this opinion a judgment will enter declaring the plaintiffs' patent invalid, dismissing the plaintiffs' action for infringement, and awarding costs unto the defendant, such costs, however, not to include an award for attorney fees.